IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| JAMES E. BALL, | CV 17-00033-H-DLC-JTJ |
| Plaintiff, | |
| vs. | ORDER AND FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| CORRECTIONAL OFFICER DAN JOHNSON, et al., | |
| Defendants. | |

Pending before the Court are Plaintiff James Ball's claims that Defendant Ross encouraged another inmate to assault him and denied him equal protection of the law (Claim 2); that Defendant Thompson[1] was deliberately indifference to Mr. Ball's serious medical needs (Claim 3); and that Defendants Johnson, Ross, and Holland retaliated against Mr. Ball (Claims 1, 2, and 5).[2]   (Complaint, Doc. 2.)

Defendants Johnson, Holland, and Thompson filed a motion for summary judgment arguing that Mr. Ball failed to exhaust his administrative remedies with

---

[1]Mr. Ball named "Crystal Foster" in his Complaint.  Defendants indicated in their Answer that Crystal Foster is now know as Crystal Thompson.  Hereinafter, the Court will refer to this Defendant as Officer Thompson.

[2]Mr. Ball named "C/O Hollen" as a Defendant in his Complaint.  Defendants indicated in their Answer that "Hollen" is actually Defendant Anthony Holland.  (Doc. 15.)  Hereinafter, the Court will refer to this Defendant as Officer Holland.

regard to the claims against them.  (Doc. 29.)  Defendant Ross filed a separate motion for summary judgment arguing that Mr. Ball failed to exhaust his administrative remedies with regard to his claim that Defendant Ross retaliated against him and was deliberately indifferent to his safety.  In addition, Defendant Ross moved for summary judgment on the merits of Mr. Ball's equal protection claim.  (Doc. 26.)  Mr. Ball filed two motions for court intervention (Docs. 36, 41) and Defendants filed a motion to strike portions of Mr. Ball's reply regarding the his first motion for court intervention (Doc. 39).

The Court finds that Mr. Ball failed to exhaust his administrative remedies with regard to his claims against Defendants Johnson and Thompson and his claim that Defendant Ross retaliated against him and was deliberately indifferent to his safety.  Further, the Court finds that summary judgment is appropriate on Mr. Ball's equal protection claim.

Summary judgment should therefore be granted to Defendants Johnson, Thompson, and Ross.  There are remaining issues of fact regarding whether Mr. Ball exhausted his claims against Defendant Holland.  Defendant Holland's motion for summary judgment should therefore be denied.

Mr. Ball's motions for court intervention should be denied but the motion to strike will be granted.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B).  Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).

4

The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). But it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

By notice provided on March 16, 2018 (Doc. 22), Mr. Ball was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998)(en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## II.   FAILURE TO EXHAUST MOTIONS FOR SUMMARY JUDGMENT

### A.  Undisputed Facts Regarding Grievance Policy

Plaintiff James Ball is an inmate in the custody of the Montana Department

of Corrections (DOC).  He was housed at the Montana State Prison (MSP) (except

for hospital stays) from September 23, 1999 until November 15, 2017 when he

was moved to the Lewistown Infirmary.  (Defendants Johnson, Holland and

Thompson's Statement of Undisputed Facts, Doc. 25 (hereinafter "SUF") at ¶ 1.)

The DOC has a grievance program available to address all issues that

adversely affect an inmate within the DOC's jurisdiction except classification,

discipline, or any other issue subject to a separate appeal procedure or

administrative process.  (SUF at ¶ 2.)  The grievance program prohibits

harassment, punishment, or discipline of an inmate for using the grievance process

and allows for employee discipline for violation of this prohibition.  (SUF at ¶ 4.)

Except for emergency grievances, certain staff conduct grievances, and

policy request grievances, the grievance process consists of four steps:  (1) an

informal resolution form directed to the unit manager (or designee), (2) a formal

grievance directed to the Grievance Coordinator, (3) an appeal to the Warden, and

(4) an appeal to the DOC Director.  (SUF at ¶ 5.)  At each level, the grievance

program provides that "[i]f an inmate's action requested is granted, he will not be

allowed to appeal the decision, and it is understood he has exhausted all administrative remedies." (SUF at ¶ 6.) If an inmate's requested action is not granted, then the DOC Director's response is the final step that exhausts all administrative remedies available to the inmate. (SUF at ¶ 7.)

Each general population unit has a secured box into which inmates can place grievances. (SUF at ¶ 8.) Grievances placed in the secured box are collected on a regular basis by the Grievance Coordinator. Unit staff, including correctional officers, case managers, and the unit manager, do not have access to the grievance box. (SUF at ¶ 9.) All grievances collected by the Grievance Coordinator, including informal resolution forms, are maintained in the prisoner's grievance file. (SUF at ¶ 10.)

Except in emergency situations, inmates must begin the grievance process with an informal resolution form submitted to their assigned unit manager or designee. (SUF at ¶ 11.) Inmates have five working days from the date of the action or omission causing the complaint to present an informal resolution form to the unit manager. (SUF at ¶ 12.) The unit manager (or designee) must respond to the informal resolution form within 20 working days of receipt of the form. If the unit manager fails to respond to the informal resolution within 25 working days, the inmate may file a formal grievance without receiving the informal response

within the next five working days.  (SUF at ¶ 14.)

The grievance program provides that, "[i]f an inmate fails to receive a timely response from a staff member . . . the inmate may file the appropriate forms to advance to the next level of the grievance program."  (SUF at ¶ 15 quoting MSP 3.3.3 (III)(D)(4).)  All forms necessary to file an informal resolution or formal grievance are available in the units, through unit staff, or through the grievance coordinators.  Appeal forms are available upon delivery of a response to a formal grievance.  If, however, an inmate believes a response is untimely, they may send a kite or ask staff to contact the grievance coordinator for the next-step appeal forms.  This is common knowledge among inmates.  (SUF at ¶ 16.)  Informal resolution forms and formal grievances are provided to inmates in triplicate. Inmates may keep the pink copy of the forms as a receipt to prove the grievance or informal resolution form was submitted.  (SUF at ¶ 17.)

The Grievance Coordinator maintains all documents pertaining to inmate grievances in an individual file for each inmate.  Inmate grievance records are also maintained in the DOC's Offender Management Information System (OMIS), a computer database.  (SUF at ¶ 18.)

 All inmates have access to the Grievance Program procedures, which are also maintained in the inmate libraries.  (SUF at ¶ 19.)  In her capacity as

grievance coordinator, Billie Reich (hereinafter "GC Reich") would answer questions from inmates about grievances and provide assistance as necessary to fill out grievances.  (SUF at ¶ 20.)

Mr. Ball demonstrated his knowledge of the grievance system in a 2014 grievance, appealed to the DOC Director, contending the grievance system was unconstitutional.  (SUF at ¶ 24.)  Mr. Ball understood the grievance program and its procedures.  (SUF at ¶ 25.)

## B.  Analysis

The Prison Litigation Reform Act ("PLRA")'s exhaustion requirement states:

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 524-25 (2002); *Booth v. Churner*, 532 U.S. 731, 741 (2001).  This means a prisoner must "complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court."  *Woodford v. Ngo*, 548 U.S. 81, 88 (2006).  Exhaustion is mandatory. *Booth,* 532 U.S. at 741; *Jones v. Bock*, 549 U.S. 199, 211 (2007).  Under the

PLRA, prison regulations define the exhaustion requirements.  *Jones*, 549 U.S. at
218.

The exhaustion requirement "requires compliance with both procedural and
substantive requirements set forth by prison grievance processes in order to ensure
that the prison receives the 'opportunity to correct its own mistakes . . . before it is
haled into federal court.' "  *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017)
(*quoting Woodford v. Ngo*, 548 U.S. 81, 89 (2006)).  A grievance will suffice "if it
alerts the prison to the nature of the wrong for which redress is sought."  *Sapp v.
Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010); *see Morton v. Hall*, 599 F.3d 942,
946 (9th Cir. 2010).  "The grievance 'need not include legal terminology or legal
theories,' because 'the primary purpose of a grievance is to alert the prison to a
problem and facilitate its resolution, not to lay groundwork for litigation.' "  *Reyes
v. Smith*, 810 F.3d 654, 659 (9th Cir. 2016) (*quoting Griffin v. Arpaio*, 557 F.3d
1117, 1120 (9th Cir. 2009)).

The defendant bears the ultimate burden of proving failure to exhaust.  *See
Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005).  If the defendant initially
shows that (1) an available administrative remedy existed and (2) the prisoner
failed to exhaust that remedy, then the burden of production shifts to the plaintiff
to bring forth evidence "showing that there is something in his particular case that

10

made the existing and generally available administrative remedies effectively

unavailable to him." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014).  Once

the defendant has carried that burden, the prisoner must produce evidence

demonstrating that "the local remedies were ineffective, unobtainable, unduly

prolonged, inadequate, or obviously futile." *Williams v. Paramo*, 775 F.3d 1182,

1191 (9th Cir. 2015) (internal citations and quotation marks omitted).

Defendants move for summary judgment based upon failure to exhaust on

Mr. Ball's retaliation claims regarding Officer Holland's "cheeking" write-up,

Officer Johnson shining a light at Mr. Ball, the medical transport of Mr. Ball, and

the allegation that Officer Ross had Mr. Ball assaulted by other inmates.

### 1. Cheeking Medications Write Up Retaliation

Mr. Ball claims he has a "hydal hernia" which makes it difficult for him to

swallow medications.  He claims that when he tried to swallow medications given

to him by Officer Holland, they came back up.  When Mr. Ball tried to talk to

Officer Holland, he alleges Officer Holland told him, "this is what litigators and

grievance filers get here at Montana State Prison."  (Complaint, Doc. 2 at 26-27.)

Defendants argue that although Mr. Ball filed a grievance against Officer Holland

for writing him up he did not appeal the denial of that grievance.  Defendants also

argue that Mr. Ball failed to file an appeal regarding his disciplinary write-up and

failed to give notice that he was claiming Officer Holland's actions were

retaliatory.  (Doc. 24 at 18.)

   As set forth above, the grievance program does not address discipline.

(SUF at ¶ 2.)  But Mr. Ball filed an informal resolution form regarding Officer

Holland's disciplinary write-up which was addressed on the merits by UM

Kremer.  Therefore, the Court will consider whether Mr. Ball exhausted his

retaliation claim against Officer Holland under either the grievance program or the

disciplinary system.

   Attached to Mr. Ball's Complaint is a disciplinary appeal form dated June

16, 2016 in which Mr. Ball states:

> When I took my medication I did swallow it but was sick all day and
> coughed it up in the lobby, there is no evidence to show I cheaked it,
> and I didn't.  At the time the medication line and the Sgt's office was
> packed with inmates, and the other officers were busy so I could not
> turn it in.  I did show UM Kremer I threw the pill in the trash when he
> came into the unit.  I should have not been found guilty of a major . . .
> I feel that at the most I should not have been found guilty of anything
> or make it a minor write-up.  The $10.00 fine is excessive.  I should
> not be fined punished for being sick to my stomach and throw-up my
> pill.  Also the 10 day cell restriction is excessive as for 90 days.  I did
> not cheak my med, the officer checked my mouth at pill pass.  Now I
> have lost my unit worker job because of this write-up.

(Doc. 2-3 at 3.)  The disciplinary decision was affirmed on June 20, 2016.  *Id.*

   This document suggests that Mr. Ball was written up for misuse of

medications sometime prior to June 16, 2016 but the parties did not introduce this write-up or the disciplinary hearing decision associated with that write-up into evidence.

Defendants did not address this June 2016 appeal form in their motion for summary judgment. It is not clear to the Court whether Officer Holland issued the June 2016 write-up, whether the June 2016 write-up is the basis of Mr. Ball's retaliation claim against Officer Holland, or whether the June 16, 2016 disciplinary appeal constituted proper exhaustion of Mr. Ball's retaliation claim. The disciplinary appeal did not specifically raise retaliation but it arguably gave the prison adequate notice of the harm being grieved. *See Norwood v. Robinson*, 436 Fed.Appx. 799 (9th Cir. 2011)(determining plaintiff exhausted administrative remedies for retaliation even though "the grievance did not advance the legal theory of retaliation" because "it gave the prison adequate notice of the harm being grieved"); *see also citing Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (explaining that a grievance need not include legal terminology or legal theories if it sufficiently provides notice of the harm being grieved). As such, there is a question of fact regarding whether Mr. Ball adequately exhausted his administrative remedies with regard to his claims against Officer Holland.

Defendants did introduce Officer Holland's July 8, 2016 write-up of Mr.

Ball for unauthorized use of medications into evidence but argued that Mr. Ball

did not exhaust his retaliation claim against Officer Holland because he failed to

file a disciplinary appeal regarding the July 8, 2016 write-up.  A hearing on

Officer Holland's write-up was held on July 13, 2016 and the disciplinary hearing

officer found Mr. Ball guilty of the violation.  (SUF at ¶ 51.)  Defendants submit

that Mr. Ball did not appeal the finding of guilt (SUF at ¶ 53) but Mr. Ball

attached a July 13, 2016 Disciplinary Appeal form to his Complaint which stated:

> The Officer Holland's write-up is false, again due to my hydal hernia
> I coughed up my meds, I have medical documentation in my medical
> file that proves I have a hydal hernia and cough things up.  This
> officer is out to get me because of my legal filings. . . .

(Doc. 2-3 at 7.)  The form was signed July 15, 2016.  Defendants did not address

this document in their motion for summary judgment and it creates an issue of

material fact regarding whether Mr. Ball exhausted his administrative remedies

regarding the July 2016 write-up for unauthorized use of medications.

Accordingly, the Court will recommend that Officer Holland's motion for

summary judgment be denied.

## 2.  Light Shining Retaliation–August 14, 2016

Mr. Ball alleges that on August 14, 2016, Correctional Officer Dan Johnson

shined a "high powered" flashlight into Mr. Ball's eyes which caused him to lose

his balance and fall hitting his back on the steel toilet in his cell.  Mr. Ball alleges

Officer Johnson then laughed and said, "got even with you 'Litigator Bitch.'"  He

alleges Officer Johnson deliberately shined a flashlight into his eyes to retaliate

against Mr. Ball for filing grievances and participating as a witness in a lawsuit

against Officer Johnson.  (Complaint, Doc. 2 at 19-22.)

Mr. Ball had until Friday, August 19, 2016 (five working days) to file an

informal resolution form complaining about Officer Johnson's alleged actions on

Sunday, August 14, 2016.  (SUF at ¶ 29.)  GC Reich searched OMIS, Mr. Ball's

paper grievance file, and the HSU-1 unit log and did not locate any grievances or

informal resolution forms regarding Officer Johnson from that time frame.  (SUF

at ¶ 30.)

Officer Kremer (hereinafter "UM Kremer") was Mr. Ball's unit manager

from January 20, 2016 to January 8, 2017.  (SUF at ¶ 27.)  UM Kremer maintained

a log in the unit documenting all informal resolution forms received from inmates.

His practice was to log the informal resolution form as soon as possible after it

was received.  (SUF at ¶ 31.)  When UM Kremer received an informal resolution

form, he would route it to the appropriate responder (for those grievances not

concerning the unit or its staff), investigate the grievance, or respond to the

inmate.  He tried to respond to grievances immediately, or as soon as possible

15

thereafter.  (SUF at ¶ 32.)  While informal resolution forms that were not routed elsewhere were pending, UM Kremer maintained them in a file in his office.  (SUF at ¶ 33.)  UM Kremer does not recall receiving an informal resolution form from Mr. Ball complaining about Officer Johnson shining a light in his eyes.  (SUF at ¶ 34.)  In addition, UM Kremer searched the HSU-1 informal resolution form log and did not locate any informal resolution forms raising Mr. Ball's allegation against Officer Johnson from that time period.  (SUF at ¶ 35.)

Mr. Ball sent an Offender-Staff Request form (OSR or "kite") to GC Reich on November 23, 2016 (three months after the alleged light shining incident) stating:  "I request to know the status of my (c/o Dan Johnson) grievance I sent you.  I also need to know the status of all grievances I have pending with your office.  Please and thank you."  (SUF at ¶ 36.)  On December 1, 2016, Kristy Cobban responded to Mr. Ball's OSR as follows:

> Mr. Ball, The only Formal we have on file recently is #8529 in regards to medications that you appealed to the Warden level . . .  I checked the unit informal log for the grievance you mention above and see no recording of an informal on that issue either.  Please send your copy for us to investigate this further.

(SUF at ¶ 37.)

On December 18, 2016 (four months after the alleged light shining incident), Mr. Ball submitted another OSR asking about the status of grievances

he said he filed against Officers Johnson and Thompson and attached a pink

inmate copy of an informal resolution form backdated to August 16, 2016 setting

forth his complaints against Officer Johnson.  Even though the form was dated

August 16, 2016, it referenced claimed efforts to resubmit the grievance in

September, October, and November.  It also mentioned Cobban's December 1,

2016, response to his first OSR.  (SUF at ¶¶ 38-39.)  Kristy Cobban responded to

Mr. Ball's OSR on December 19, 2016, stating the following:

> Mr. Ball – the form you sent us was the pink copy of an informal
> dated 8/16/16.  Per 3.3.3 if you did not receive a response by 9/13/16
> then give another 5 working days for UM to serve response to
> 9/20/16, you were to complete a formal grievance at that time.  You
> failed to do so and therefore have chosen to not proceed in the
> grievance process as a result.

(SUF at ¶ 40.)

By informal resolution form dated December 18, 2016, Mr. Ball grieved

UM Kremer for failing to answer grievances he alleges he filed on Dan Johnson

and Crystal (Foster) Thompson.  (SUF at ¶ 41.)  In response to Mr. Ball's informal

resolution form, UM Kremer said, "All of your informal grievances have been

answered or referred for an answer."  (SUF at ¶ 42.)  Mr. Ball's grievance file does

not include any formal grievance or appeal advancing his December 18, 2016,

informal resolution request to UM Kremer.  (SUF at ¶ 43.)

17

The undisputed facts establish that Mr. Ball did not file a timely grievance regarding the August 14, 2016 incident.  Although he started asking about the status of an alleged grievance in November, there is no evidence to support his claim that he filed a timely grievance.  Grievance forms are in triplicate, enabling inmates to retain a record of any grievance submission.  (Doc. 25 at ¶ 17; Doc. 28 at ¶ 17, SUF at ¶ 17.)  Mr. Ball did not produce a pink copy of any timely grievance submitted regarding the August 14, 2016 incident.

In addition, the Grievance Program permits inmates to advance grievances to the next level after a specific period of time if they do not receive a response.  (Doc. 25 ¶¶ 14-16; Doc. 28 ¶¶ 14-16.)  Therefore, even if any of Mr. Ball submitted a grievance regarding the August 14, 2016 incident which was not processed, Mr. Ball could have proceeded to the next level of the grievance procedure in an effort to exhaust his administrative remedies.  Mr. Ball presented no evidence that he attempted to advance a timely grievance regarding the August 14, 2016 incident after not receiving a response within a particular amount of time.

As such, the Court finds that Mr. Ball did not  "complete the administrative review process in accordance with the applicable procedural rules  . . . " *Woodford*, 548 U.S. at 88.  Defendant Johnson has established that (1) an available administrative remedy existed and (2) Mr. Ball failed to exhaust that remedy.  *See*

*Albino*, 747 F.3d at 1172.

### 3. Transport–November 14, 2016

Mr. Ball alleges that Defendant Thompson ordered him to be transported in a regular prison vehicle from St. Patrick Hospital in Missoula to MSP on November 14, 2016 causing him to suffer the unnecessary wanton infliction of pain on his permanently injured back, paralyzed left leg, and swollen right leg. Mr. Ball alleges this constituted deliberate indifference to his pain and suffering. (Complaint, Doc. 2 at 24-25.)

Neither OMIS, Mr. Ball's grievance file, nor the HSU-1 informal resolution log contains any grievances or informal resolutions filed against Officer Thompson regarding this incident.  (SUF at ¶ 47.)  In addition, UM Kremer does not recall receiving any informal resolution form or grievance from Mr. Ball regarding Officer Thompson.  (SUF at ¶ 48.)  Mr. Ball has presented no documents to support his conclusory statements that he grieved this incident.  The undisputed facts establish that Mr. Ball did not file an informal resolution form, a formal grievance, or appeal regarding his allegations that Officer Thompson ordered his transportation in a regular prison vehicle in deliberate indifference to his medical needs and/or in retaliation for his litigation activities.  As such, Officer established that (1) an available administrative remedy existed and (2) Mr. Ball

failed to exhaust that remedy.  *See Albino*, 747 F.3d at 1172.

### 4.  December 14, 2016--Ross–Retaliation

Mr. Ball alleges Officer Ross encouraged another inmate to punch him in the face on December 14, 2016.  He claims the inmate who assaulted him told other inmates that Officer Ross encouraged him to assault Mr. Ball and that he got special treatment from other staff for assaulting Mr. Ball.  Mr. Ball claims these acts by Officer Ross were done in retaliation for his grievances filed against Officer Ross and her staff friends and for filing legal cases.  (Complaint, Doc. 2 at 22-24.)

In 2015 and 2016, Officer Kerrie Ross was a correctional officer often assigned as the control cage officer for the MSP infirmary.  (Ross Statement of Undisputed Facts, Doc. 28 (hereinafter "Ross SUF" at ¶ 31.)  Neither Mr. Ball's grievance file, OMIS, nor the HSU-1 unit log contain any grievances or informal resolution forms alleging Officer Ross encouraged another inmate to assault Mr. Ball.  (Ross SUF at ¶ 33.)  Mr. Ball's filed a grievance against Officer Ross, dated August 10, 2016, complaining that Officer Ross was hostile and confrontational to him.  But the grievance makes no allegations that Officer Ross was encouraging other inmates to assault him.  (Ross SUF at ¶ 34.)  Mr. Ball provided this Court with a pink inmate copy of an informal resolution form he says he lodged against

Officer Ross on August 24, 2016.  It includes no allegation that Officer Ross encouraged an inmate to assault him.  (Ross SUF at ¶ 35.)

The undisputed facts establish that Mr. Ball did not file an informal resolution form, a formal grievance, or appeal regarding his allegations that Officer Ross encouraged another inmate to assault him in retaliation for his litigation activities.  As such, the Court finds that Mr. Ball did not  "complete the administrative review process in accordance with the applicable procedural rules." *Woodford*, 548 U.S. at 88.  Defendant Ross has established that (1) an available administrative remedy existed and (2) Mr. Ball failed to exhaust that remedy.  *See Albino*, 747 F.3d at 1172.

### 5.  Mr. Ball's Arguments

Having found that Defendants met their burden of showing that (1) an available administrative remedy existed and that (2) Mr. Ball failed to exhaust that remedy, the burden of production shifts to the Mr. Ball to bring forth evidence "showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *See Albino*, 747 F.3d at 1172.  Mr. Ball makes generalized conclusory statements arguing that administrative remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.  (Doc. 32 at 3-4.)  He has however,

21

failed to produce any evidence to support these conclusory statements.

He first claims his grievances were not allowed to be filed or processed after he turned them into prison staff for processing. (Response, Doc. 32 at 4.) But as Defendants have established, grievance forms are in triplicate, enabling inmates to retain a record of any grievance submission. (Doc. 25 at ¶ 17; Doc. 28 at ¶ 17, SUF at ¶ 17.) Mr. Ball could have kept the pink copy of any grievance he submitted as a receipt to prove the grievance or informal resolution form was submitted. (SUF at ¶ 17.) Mr. Ball produced no grievance forms which he contends were submitted to prison officials but not processed.

In addition, the Grievance Program permits inmates to advance grievances to the next level after a specific period of time if they do not receive a response. (Doc. 25 ¶¶ 14-16; Doc. 28 ¶¶ 14-16.) Therefore, even if any of Mr. Ball's grievances were not processed, Mr. Ball could have proceeded to the next level of the grievance procedure in an effort to exhaust his administrative remedies. Mr. Ball presented no evidence that he attempted to advance his grievances after not receiving a response within a particular amount of time.

Mr. Ball also alleges that Officer Kremer and Grievance Officer Cobban told him that his grievances would not be fully processed and his case would be dismissed for failing to exhaust because DOC attorneys had instructed them to do

this because they did not want him back in a courtroom concerning this matter.

(Doc. 32 at 7.)  Even if such a meeting occurred, Defendants presented significant

evidence that Mr. Ball's grievances were in fact processed on regular basis.  Mr.

Ball's grievance file reveals Mr. Ball was an experienced and prolific user of the

grievance process.  The undisputed facts establish that Mr. Ball filed hundreds of

grievances in his time at MSP.  Since January 2014, Mr. Ball filed more than 45

formal grievances and/or informal resolution forms, properly appealed at least 10

grievances to the DOC Director, and had grievances granted in whole or in part

approximately 20 times.  (SUF at ¶¶ 21, 22, 23.)  Mr. Ball's grievance file consists

of 124 pages and reveals the prison dutifully and properly documented numerous

grievances from Mr. Ball.  (Grievance File, Doc. 25-3.)  Mr. Ball's claims raised

in this matter arose between July 2016 and December 2016.  During that time

frame alone Mr. Ball filed eight grievances which were processed by Defendants.

Finally, Mr. Ball was transferred to the Lewistown Infirmary due to health

issues on November 15, 2017.  (Doc. 25-13 at 1.)  He argues that since then he has

been denied contact with his inmate witnesses who he claims would verify that he

answered all his grievances pertaining to this matter in a timely manner.  He

contends Unit Manager Johnson at the Lewistown Infirmary told him he could not

contact his witnesses per instruction of the DOC legal department and if he tried to

contact witnesses to get affidavits he would be transferred back to the high

security side of MSP with loss of his custody level and loss of medical care

regardless of his need for that medical care.  (Doc. 32 at 10-11.)  He also claims he

had approximately 15 declarations/affidavits from inmate witnesses at MSP

stating they saw him do responses to grievances against Defendants and turn them

into staff (mainly staff in close unit one) for processing.  He claims UM Kremer

and property room staff did not allow him to have those declarations/affidavits

when he was transferred and they have disappeared.  (Doc. 32-1 at 5.)

The Court finds that even if witnesses saw Mr. Ball writing grievances that

would be insufficient evidence to overcome Defendants' motions for summary

judgment.  As set forth above, Mr. Ball filed numerous grievances during the time

period in question.  He does not provide the names of the alleged witnesses to his

grievance writing and he does not explain how those witnesses would have known

what grievance he was writing.  Further, as set forth above, he has not presented

the pink copies of any grievance forms which he claims were not processed.

Accordingly, the Court recommends that Defendants Johnson, Thompson,

and Ross's motions for summary judgment based upon failure to exhaust

administrative remedies be granted.  Defendant Holland's motion for summary

judgment should be denied for the reasons set forth above.

## III.  DEFENDANT ROSS'S MOTION FOR SUMMARY JUDGMENT ON EQUAL PROTECTION CLAIM

Mr. Ball alleges in his Complaint that he "was denied my diabetic insulin by Officer Ross and Janet and Redfern, because I would not be treated differently and let staff draw my insulin for me, yet other inmates got to draw their own diabetic insulin, and I had drawn my diabetic insulin for approx. 30 or more years prior." (Complaint, Doc. 2 at 23-24.)

Mr. Ball is an insulin-dependent diabetic.  He receives insulin administered by injection.  (Ross SUF at ¶ 43.)  For insulin-dependent diabetics, the standard procedure at the MSP infirmary is for either the inmate or an infirmary staff member to draw insulin into a syringe from a bottle.  The inmate then injects the insulin.  (Ross SUF at ¶ 44.)  In general, the infirmary staff will allow inmates to draw their own insulin unless the inmate has difficulty doing so.  (Ross SUF at ¶ 45.)  The infirmary is responsible for providing care to all of the 1,576 inmates at MSP.  The infirmary sees 130 inmates on an average weekday and 80 inmates on an average weekend day.  To provide care for everyone, the infirmary must ensure an efficient operation.  (Ross SUF at ¶ 46.)

Prior to 2015, Mr. Ball drew and injected his own insulin.  (Ross SUF at ¶ 48.)  In 2015, however, Mr. Ball took an increasingly long time to draw his own

25

insulin because of difficulties he had drawing insulin.  Infirmary staff began

calling Mr. Ball 30 minutes earlier than other diabetic inmates so he could draw

and inject his insulin.  (Ross SUF at ¶ 48.)  The length of time, however, that Mr.

Ball took to draw his own insulin disrupted the efficient operation of the

infirmary.  Calling Mr. Ball up earlier than other inmates disrupted both infirmary

and security operations. (Ross SUF at ¶ 49.)  Therefore, infirmary staff began to

draw Mr. Ball's insulin for him.  (Ross SUF at ¶ 50.)  The infirmary staff's

practice with Mr. Ball was consistent with how the infirmary staff treated other

diabetic inmates.  (Ross SUF at ¶ 51.)

Officer Ross was not a member of the medical staff and was not permitted

to influence or make decisions about medication administration or whether

inmates could draw their own insulin.  (Ross SUF at ¶ 52.)  Officer Ross did not

participate in the decision to have staff draw Mr. Ball's insulin for him.  (Ross

SUF at ¶ 53.)  Neither Officer Ross nor any infirmary staff member denied Inmate

Ball his insulin.  (Ross SUF at ¶ 54.)

Whether or not Mr. Ball was treated differently from similarly situated

inmates is irrelevant because he presented no evidence that Officer Ross was

responsible for the decision to have staff draw his insulin for him.  As such,

Officer Ross's motion for summary judgment on this issue should be granted.

Further, the Court finds that Mr. Ball failed to present a genuine issue of material fact regarding his equal protection claim. The Equal Protection Clause of the Fourteenth Amendment is essentially a direction that all similarly situated persons be treated equally under the law. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). In order to state an equal protection claim, a plaintiff must allege facts demonstrating that defendants acted with the intent and purpose to discriminate against him based upon membership in a protected class, or that defendants purposefully treated him differently than similarly situated individuals without any rational basis for the disparate treatment. *Lee v. City of L.A.*, 250 F.3d 668, 686 (9th Cir. 2001); *see also Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Mr. Ball is not a member of a protected class and Defendants established that there was a rational basis for treating him differently from inmates who were allowed to draw their own insulin. The undisputed evidence is that Mr. Ball began having difficulties drawing his own insulin and was taking an increasingly long time to draw his own insulin. Although infirmary staff began calling Mr. Ball early to draw and inject his insulin, this became a disruption on the efficient operation of the infirmary and disrupted both infirmary and security operations. (Ross SUF at ¶ 49.) As a result, infirmary staff began to draw Mr. Ball's insulin

27

for him.  (Ross SUF at ¶ 50.)

The Court finds these facts establish a rational basis for treating Mr. Ball different from other diabetic inmates.  Defendant Ross's motion for summary judgment on this issue should be granted.

## IV.  MOTIONS FOR COURT INTERVENTION AND TO STRIKE

In his first motion for court intervention, Mr. Ball complains that staff at the Lewistown Infirmary discriminated against him and denied him meaningful access to the court by "refusal to allow me to communicate with staff, at MSP to contact witnesses in this case and to make higher staff at MSP making them aware of theft of mail, legal mail, and court exhibits, in this case."  (Doc. 36 at 2.).  In his second motion for court intervention, he complains that staff at Lewistown Infirmary are denying him medical care, due process, and access to the courts.  (Doc. 41.)

To the extent that these motions can be construed as requests for injunction relief they should be denied.  As a general rule courts are unable to issue orders against individuals who are not parties to a suit pending before it.  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969); *Zepeda v. United States Immigration Service*, 753 F.2d 719, 727 (9th Cir. 1985) ("A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of

persons not before the court."). Here, the staff at Lewistown Infirmary are not parties to this litigation. The motion for injunctive relief should be denied.

In his reply regarding his first motion for court intervention (Doc. 38), Mr. Ball sets forth a number of additional facts regarding his incarceration at the Lewistown Infirmary. Defendants moved to strike the reply because it raises new factual allegations and seeks to amend to name new parties. (Doc. 39.)

New arguments are inappropriate in a reply brief. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996). District courts should not permit parties to "submit 'new' evidence in their reply without affording [the non-movant] an opportunity to respond." *Id.* Mr. Ball's new factual allegations in his reply are stricken and have not been considered by this Court in ruling on Mr. Ball's motion. In addition, the deadline for amending pleadings has long passed. Any request to add new parties at this late date is denied.

Based upon the foregoing, the Court issues the following:

## ORDER

Defendants' Motion to Strike Mr. Ball's Reply to their Response to his Motion for Court Intervention (Doc. 39) is GRANTED.

## RECOMMENDATIONS

1. Defendant Ross's Motion for Summary Judgment (Doc. 26) should be

GRANTED.

2.  Defendants' Motion for Summary Judgment (Doc. 29) should be GRANTED as to Defendants Johnson and Thompson and DENIED as to Defendant Holland.

3.  Mr. Ball's Motions for Court Intervention (Docs. 36, 41) should be DENIED.

### NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[3]  28 U.S.C. § 636.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.  This order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed until entry of the District Court's final judgment.

DATED this 10th day of December, 2018.

                    */s/ John Johnston*
                    John Johnston
                    United States Magistrate

---

[3]Rule 6(d) of the Federal Rules of Civil Procedure provides that "[w]hen a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C) (mail) . . . 3 days are added after the period would otherwise expire under Rule 6(a)."  Therefore, since Mr. Ball is being served by mail, he is entitled an additional three (3) days after the period would otherwise expire.